**AETNA CASUALTY & SURETY COMPANY, Appellant,**

v.

**Thomas L. BURRIS, Appellee.**

**No. 1332.**

Court of Civil Appeals of Texas, Tyler.

June 5, 1980.

Rehearing Denied June 26, 1980.

MOORE, Justice.

This is a worker's compensation case. Appellee, Thomas L. Burris, filed a claim for worker's compensation benefits with the Industrial Accident Board for injuries alleged to have been sustained while employed by Vulcraft, a division of Nucor Corporation. The Board denied his claim and Burris appealed to the district court, alleging in his petition that between November 1968 and June 7, 1976, he sustained both an injury and an occupational disease arising out of his employment as a truck driver. He alleged that as a result of his injury and occupational diseases, he was totally and permanently disabled. He prayed for a recovery for past and future compensation benefits as well as costs of medical care. The carrier, Aetna Casualty and Surety Company (Aetna), answered with a general denial and denied that Burris suffered any disability while in the course and scope of his employment with Vulcraft. Trial was before the court and a jury. At the close of the evidence, Aetna made a motion for an instructed verdict, and after such motion had been overruled, the cause was submitted to the jury. In response to special issues, the jury found that Burris suffered an occupational disease which arose in the course and scope of his employment. The jury further found that Burris was totally and permanently incapacitated and that the occupational disease was a producing cause of his incapacity. After Aetna's motion for judgment non obstante veredicto had been overruled, the trial court entered judgment awarding Burris accrued compensation benefits in the amount of $9,800 less $550 theretofore paid, future disability payments in the amount of $16,577.86, and cost of medical care in the amount of $117.50. Aetna perfected this appeal.

We reverse and render.

The Worker's Compensation Act[1] of this state provides that an occupational disease as defined by the Act is compensable. The Act provides that the term "occupational disease" shall be construed:

Don W. Kent, Tyler, for appellant.

Charles L. Carter, Jr., Crockett, for appellee.

1. Tex.Rev.Civ.Stat.Ann. art. 8306 sec. 20 (Vernon Supp.1980).

. . . to mean any disease arising out of and in the course of employment which causes damage or harm to the physical structure of the body and such other diseases or infections as naturally result therefrom. An "Occupational Disease" shall also include damage or harm to the physical structure of the body occurring as the result of repetitive physical traumatic activities extending over a period of time and arising in the course of employment; provided, that the date of the cumulative injury shall be the date disability was caused thereby. Ordinary diseases of life to which the general public is exposed outside of the employment shall not be compensable, except where such diseases follow as an incident to an "Occupational Disease" or "Injury" as defined in this section.

The jury found: (1) that Burris has or had an occupational disease as a result of repetitious physical traumatic activities extending over a period of time while employed by Vulcraft; (1A) that the occupational disease sustained by Burris arose out of and in the course of his employment; (2) that the occupational disease was a producing cause of any total incapacity; (2A) that the beginning date of his total incapacity was August 2, 1976; and (2B) that the duration of his total incapacity would be permanent. No issues were submitted on the theory that Burris suffered an accidental injury as a result of some particular strain, exertion, or other precipitating event traceable to a definite time, place, and cause.

Under the first and second points of error, Aetna asserts that there is no evidence that Burris suffered an occupational disease and that the trial court therefore erred in overruling its motion for an instructed verdict and motion for judgment non obstante veredicto.

In considering these points of error, we are mindful of the rule that in determining a "no evidence" point, the appellate court will consider only the evidence and inferences which such evidence reasonably permits and will support the challenged findings, disregarding all evidence and inferences to the contrary. *Lucas v. Hartford Accident and Indemnity Co.*, 552 S.W.2d 796, 797 (Tex.1977); *Garza v. Alviar*, 395 S.W.2d 821, 823 (Tex.1965).

Appellee alleged in his petition, and sought to prove at the trial, that he suffered from the following occupational diseases as a result of his employment as a truck driver: (1) severe migraine headaches; (2) hypoglycemia (low blood sugar); (3) blurred vision, temporary blindness, and loss of visual fields; (4) hypertension; (5) acute gastritis; (6) chest pains; and (7) depressive reaction.

In *Transportation Insurance Co. v. Maksyn*, 580 S.W.2d 334 (Tex.1979), our supreme court recently held that repetitious mental traumatic activities cannot produce a compensable occupational disease under section 20 of the Texas Worker's Compensation Act. The court further held that in order for a claimant to recover under section 20 of the Act, the proof must show (1) that he contracted a disease, (2) which arose out of his employment, and (3) that the disease was a result of repetitious physical traumatic activities causing damage or harm to the physical structure of the body. Inasmuch as Burris makes no contention that he sustained an accidental injury, the crucial question presented in this case is whether there is any evidence of probative force to show the existence of a disease caused by "repetitious physical traumatic activities" arising out of his employment.

At the trial, Burris testified that although he continued to work until August 2, 1976, his various ailments culminated in a physical breakdown on June 7, 1976. He testified that during the time that he was employed as a truck driver, commencing November 1968 through June 7, 1976, his duties subjected him to numerous traumatic activities which eventually resulted in his disability. In this connection, he testified that: (1) from 1974 on, he was forced to drive a Mack truck that was very hard on all the drivers physically; (2) he was subjected to severe jolting up and down in the other trucks before 1974 and in the Mack

trucks thereafter; (3) he was forced to hold tightly to the steering wheel in order to operate the truck; (4) he had great difficulty turning the truck when he arrived in cities where the traffic was heavy; (5) he had to keep his eyes "glued" to the highway; (6) the truck that he drove weighed 30,000 pounds and the loaded trailer 90,000 pounds for a total of sixty tons; (7) he was forced to drive long hours; (8) he was forced to make long trips too close to each other; (9) he was forced to follow impossible schedules; (10) he was not allowed to rest or sleep; (11) he had no time to eat; (12) he was subjected to the stress of meeting time tables—"8:00 o'clock deliveries"; (13) he had to drive trucks upon which steel was unsafely loaded; (14) he had to drive loads that exceed maximum weight; (15) for over 100 days he had to drive a truck and trailer with defects; (16) he was subjected to the stress and strain of delays and the conditions at the loading sites; (17) he was required to tie down all his loads, exerting unusual physical activity in doing so every time he took a load out; and (18) as a result of the difficulty of driving the 1974 Mack truck, and all of the above, he had a violent onset of loss of vision, high blood pressure, sweating, and migraine headaches in Albuquerque and Roswell, New Mexico, culminating on June 7, 1976, and as a result he had to be hospitalized.

Although Burris testified that he was forced to drive long hours and meet impossible schedules, he conceded that he was not compelled to do so. He stated that he drove long hours because he believed that if he did not do so, his employer would penalize him by giving him less work.

With regard to his activities immediately before his breakdown, Burris testified that he left his place of employment at Grapeland, Texas, at 6:00 a. m. on June 6, 1976, with a truck load of steel, a part of which was to be delivered in Albuquerque and the remainder in Roswell, New Mexico. He testified that he drove straight through to Albuquerque, a distance of 816 miles, arriving there at 4:00 a. m. on June 7, 1976. When he arrived he was extremely tired and fatigued. After eating he became nau-

seated but finally went to sleep in his truck. When he awoke, he could see only half of everything; his chest got tight and he commenced perspiring; he had a bad headache and had sharp pains over his ears. He then unloaded a part of the steel in Albuquerque and left for Roswell, a distance of 300 miles, during which time his vision continued to be impaired. He arrived in Roswell at approximately 2:00 p. m. When he reached his destination, he had a headache, his face was burning, and he was sweating profusely although the weather was not hot. While the steel was being unloaded, someone noticed his condition and offered to take him to the hospital. When he arrived at the hospital, the doctor checked his blood pressure and found it to be very high. He was admitted to the hospital where he remained for two days. When he left the hospital his vision was good. However, while returning home on June 9, he began to feel bad again and stopped at a hospital in Abilene. His wife picked him up in Abilene on the morning of June 10 and drove him back to his home at Madisonville where he was admitted to the hospital. He remained in the hospital until June 15, 1976, under the care of his family physician, Dr. Bob Jones.

Dr. Jones testified that he saw him in the hospital on June 10, 1976, and took a history of his complaints. He testified that Burris told him that he had been suffering from blurred vision and a loss of visual fields. After performing a physical examination, Dr. Jones testified that the results were completely unremarkable as far as findings were concerned and that he could find nothing which he considered abnormal. When asked if he made a diagnosis of Burris' condition at that time, Dr. Jones testified: "Yes, I thought that this was probably an episode that was brought about by tension, fatigue and some depressive aspects in the patient because of his hours and the time he was putting in and the responsibility that he was carrying." The doctor explained that the visual field change did not amount to damage to the eyes but was related to the fatigue and stress of driving, and that he found no evidence of blindness. He tes-

tified that prior to June 10, 1976, he had treated Burris for acute gastritis and other ailments, and from June 10, 1976, to August 28, 1978, he treated him for hypoglycemia (low blood sugar), chest pains, headaches, hypertension, and depressive reaction. He explained that the patient's hypertension was not the "essential" or the disease kind but was the "labile" which meant that it was caused by stress. When there was no stress, the blood pressure was normal. He testified that the chest pains, headaches, and nervousness are classified as symptoms rather than diseases. Upon being asked whether his findings indicated damage or harm to the physical structure of the patient's body as a result of his work activity, the doctor answered: "The visual field changes, this type thing, are not explained by any particular pattern that we can establish so far as a damage to the visual field tracks of the eyes themselves. It is my opinion that this was probably related to the fatigue, the stress of driving—." The doctor was also asked if he could express, with reasonable medical certainty, the probable cause of the patient's blurred vision, loss of visual fields, hypertension, nervousness, and chest pain. In reply, he stated: "This, as I stated earlier, now as far as the labile hypertension I think this is something that has predated the episodes in June of '76. But the others I think are related to this condition in which he had gotten into, the fatigue and stress that he had during this period of time." The doctor went on to add that Burris was physically able to perform the usual task of a truck driver provided that he did not work long hours.

Dr. Floyd Verheyden, who examined Burris on behalf of Aetna, testified that as a result of his physical examination, he could not find any abnormalities except for some arthritis in the cervical spine. Both Dr. Jones and Dr. Verheyden testified that all of the occupational diseases complained of by Burris were ordinary diseases of life to which the general public is exposed and are not indigenous to the work of a truck driver.

In *Transportation Insurance Company v. Maksyn*, supra, a comparable fact situation was presented. The court, after reviewing the evidence relating to Maksyn's claimed injury, stated: "Mr. Maksyn's situation was such that after forty-three years of work, he had succumbed to the pressure, mental *strain, overwork, and exhaustion from his* managerial duties which culminated in hypertension, nervousness, vertigo, anxiety depression, and disability to perform his work in publishing two newspapers a day. There was an abundance of evidence that mental stimuli produced Mr. Maksyn's condition but no evidence that any physical traumatic activity produced it."

The court went on to point out that the Texas legislature drew the line for compensability for occupational diseases by limiting coverage to those cases in which physical activities cause harm or injury and by denying coverage when mental activities cause the harm or injury. The court pointed out that the line drawn by the Texas legislature in section 20 was consistent with that drawn by the majority of jurisdictions in the country and quoted by illustration from an Arizona decision in which it was stated that ". . . a disabling mental condition brought about by the gradual buildup of emotional stress over a period of time and not by an unexpected injury causing event is not compensable unless accompanied by physical force or exertion." See *Ayer v. Industrial Commission*, 23 Ariz. App. 163, 531 P.2d 208 (1975).

After a careful review of the record, we conclude that there is no evidence of probative force that any of the occupational diseases complained of by Burris was the result of repetitious physical traumatic activities arising out of the course of his employment as a truck driver. In our view the proof relied on by Burris to support his *claim for compensation rests on repetitious* mental traumatic activities rather than repetitious physical activities. For this reason, the proof is legally insufficient to support a recovery under section 20 of the Act.

█ By the sixth point, Aetna asserts that the trial court erred in overruling its

motion for judgment notwithstanding the verdict, because the evidence conclusively shows that the diseases complained of by Burris are ordinary diseases of life to which the general public is exposed outside of the employment of a truck driver and are not therefore compensable under section 20 of the Act. We have concluded that the point is well taken and must be sustained.

Ordinary diseases of life to which the general public is exposed outside of the employment shall not be compensable under the Act unless the disease follows as an incident to a compensable occupational disease or accidental injury. Both medical witnesses testified that the diseases or infirmities complained of were ordinary diseases of life to which the general public is exposed and were not indigenous to the work of a truck driver. Consequently, for this additional reason, the proof conclusively shows that Burris did not suffer a compensable occupational disease under section 20 of the Act.

In view of the ruling that we have made, we do not reach the remaining points brought forward by Aetna.

Accordingly, the judgment is reversed, and judgment is hereby rendered that appellee, Thomas L. Burris, take nothing.